318 F.Supp.2d 1057 (2004)
THE UNITED STATES of America for the Use and Benefit of JOHNSON PUGH MECHANICAL, INC., Plaintiff,
v.
LANDMARK CONSTRUCTION CORPORATION and The Mountbatten Surety Co., Inc., Defendants,
Doug Pourier, William Clary, Kathleen Clary, and PI Construction Corporation, Third-party Defendants.
No. CIV.01-B-2406(BNB).
United States District Court, D. Colorado.
May 21, 2004.
*1058 David L. Shakes, Hendricks, Hendricks & Shakes, P.C., Colorado Springs, CO, for Plaintiff.
Mike F. Pipkin, Sedgwick, Detert, Moran & Arnold, LLP, Dallas, TX, for Defendants, Cross-Claimant and Third-Party Plaintiff.

FINDINGS OF FACT AND CONCLUSIONS OF LAW AND ORDER
BABCOCK, Chief Judge.
This is a Miller Act action. See 40 U.S.C. §§ 3131(a)-(d). A trial to the Court *1059 was held February 23, 2004 through February 26, 2004. Plaintiff Johnson Pugh Mechanical, Inc. ("Johnson Pugh," or "JP") demands payment of $1,158,239.99 plus interest based on payment bonds executed by Defendant Mountbatten Surety Company, Inc. ("Mountbatten") for Defendant Landmark Construction Corporation ("Landmark"), principal on the bonds. Pursuant to the General Indemnity Agreement ("Agreement") executed prior to the issuance of these bonds, Third-party Defendants Doug Pourier, William Clary, Kathleen Clary, PI Construction Corporation ("PI"), and Defendant Landmark-who is also the principal on the bonds-agreed to indemnify Mountbatten against, inter alia, liability, losses, and other costs arising from the payment of these bonds.
Landmark is insolvent. A default judgment was entered against it. A default judgment was also entered against PI. Therefore, Johnson Pugh brought claims against Landmark's payment and performance bonds to recover the amount it alleges is due pursuant to asserted subcontract agreements with Landmark.
In defense, Mountbatten contends that Johnson Pugh is an "insider," or the alter ego of Landmark, Clary, or one or more of the indemnitors on the bonds, so may not make a claim against the bonds. Mountbatten also contends that Johnson Pugh did not perform subcontracts for Landmark in the first place. Mountbatten asserted a cross-claim against Landmark for breach of the indemnity agreement. Mountbatten also brought third-party claims against Pourier, the Clary's and PI for breach of the indemnity agreement. Clary represented himself at trial, and asserted the defense of fraud.
Jurisdiction arises under 40 U.S.C. §§ 270(a)-(d). For the following reasons, I find and conclude that Plaintiff has failed to establish it should receive payment. Therefore, I enter judgment in favor of Defendant Mountbatten, and conclude that Mountbatten's cross-claim and third-party claims are moot.

I. Findings of Fact
I find the following facts based on a preponderance of the evidence. This case involves a web of companies often formed and sometimes owned by Third-party Defendant William Clary. Due to the complex interrelatedness of the companies, questions arose about their true identities, their roles in the circumstances underlying this case, and whether Clary advised, controlled, or otherwise influenced them.

A. Landmark
Defendant Landmark Construction Corporation, a minority § 8(a) construction contractor, contracted with the United States government to renovate barracks at Fort Carson, a U.S. Army base in Colorado Springs, Colorado. See 15 U.S.C. § 637(a) (Small Business Act of 1953). Landmark's sole owner and president, Third-party Defendant Doug Pourier, an American Indian, worked with Clary, sole owner and president of PI Construction Corporation, to obtain payment and performance bonds for the project that were required by the Miller Act, 40 U.S.C. §§ 3131(a)-(d).
According to the credible testimony of Pourier and Michael Adams, a former project manager for PI, in 1988, Landmark subcontracted for PI at Ellsworth Air Force Base in South Dakota. Clary testified at trial that he was in control of PI "at all times." After Landmark initially was turned down for a bond on the Fort Carson project, Pourier approached Adams to determine whether PI would be interested in a joint venture with Landmark at Fort Carson. Adams then introduced Pourier to Clary. Pourier said he approached PI and Clary with the project in order to solicit help with the bonding and reap the *1060 benefit of Clary's experience with government contracting. It is undisputed that Landmark needed PI's help to secure the bonds.
Defendant Mountbatten issued a total of thirteen bonds to Landmark for the Fort Carson job. Of those, Mountbatten bond numbers ALL1-000006 PP, ALL1-000007 PP, ALL1-000008 PP, ALL1-000015 PP and ALL1-000016 PP, all of which had effective dates of March 8, 2001, are at issue here. Landmark, Pourier, Clary, Clary's wife, Kathleen, and PI indemnified all of the bonds obtained by Landmark, and pledged all of their individual assets as required under the indemnification agreements. See Defendant's Ex. A1, A2. Neither Clary nor PI ever owned any interest in Landmark.
Pourier testified that Clary made the major decisions for Landmark after Landmark became an 8(a) contractor. He testified that Clary controlled Landmark's payments to subcontractors. If a payment was not being made, Pourier would talk to Sandy Taylor at the financial accounting company Martin Mink, which performed accounting and financial services for Landmark. Martin Mink was owned wholly by Clary, so Taylor would talk to Clary about Landmark's financial problems. Pourier testified that he was concerned about Landmark's ability to finance and complete its contracts as the company began to grow in Colorado. Pourier talked to Clary and Sandy Taylor on many occasions about this concern, but his concerns were never allayed.
Pourier also testified that Clary moved personnel between PI and Landmark, and that Clary's companies PI, Martin Mink, Johnson Pugh, Baker White, and Mill Shop all had offices at the Pond Springs complex in Texas, along with Landmark. Id. at 38. He also recalled that Landmark, PI, Johnson Pugh, and Clary shared office space.
Clary testified as an adverse witness for Plaintiff, and testified on his own behalf, as well. I find that Clary's testimony was not altogether credible. However, Clary credibly testified he was Landmark's signatory on three accounts with Chase Bank. Clary also held himself out as Secretary of Landmark, had signatory authority for the company, and controlled who else had signatory authority. See Dfdt's Ex. A34.
Clary credibly testified that in January 2001, Landmark assumed the payroll of JP and took over its employees. A report prepared by Nancy Krenek, account manager at Martin Mink, confirms that all but three employees of Johnson Pugh were terminated or received their last paycheck no later than January 26, 2001, and the others were terminated as of February 22, 2001, well before March 8, 2001, the payment and performance bonds date. See Defendant's Ex. O.
Clary admitted that JP could not and did not purchase or supply materials for the Fort Carson project, and that Landmark could not finish the project because it did not have enough credit with the suppliers. Yet Clary also said he told outsiders that Landmark would complete JP's work at Fort Carson. On cross-examination, Clary credibly testified that he regularly moved money paid to Landmark from the United States to PI and JP. See Plft's Ex. 64.
Clary and Pourier obtained the payment and performance bonds through a broker named Rick Barrick, then of Allied Surety Company ("Allied"). See Pltf's Exs. 4, 5. Barrick owned 45% of the shares of Allied, and controlled Allied during the period of time relevant to this case. Allied acted as surety broker for Mountbatten pursuant to an agency agreement. By virtue of a power of attorney, Mountbatten authorized Barrick and Allied to issue bonds on its behalf up to $6 million.
*1061 Clary and Barrick worked together to secure bonds for Landmark. See Ex. 82. However, Barrick became much more than a bonds broker to Clary. The evidence demonstrates he became an integral player in the network of Clary-influenced companies. Clary credibly testified that Barrick met with Clary at Clary's offices weekly to discuss the business and finances of Landmark, PI, JP, and Martin Mink.
Barrick testified that the surety company previous to Mountbatten, Acstar, would not provide more bonds to Landmark unless Barrick painted a better picture of the Clary companies. Therefore, Barrick strove to find out as much as he could about Landmark and the Clary companies. Barrick testified that when he was providing bonds to Landmark on behalf of Mountbatten, he considered Bill Clary the owner of JP. Barrick depo., April 25, 2003, at 117.
Barrick testified that he was at Landmark's offices at least twice a month between 1998 and May 2000, and much more often between May 2000 and June 2001. Id. at 128, 129. He said he told Mountbatten manager Jim Albright that Clary ran the day-to-day operations of Landmark. Barrick depo., April 25, 2003, at 131, 132. Barrick said that he believed Clary was running Landmark's day-to-day operations behind the scenes, because he witnessed Clary running "all the companies ... by making all the decisions." Id. at 132. He said that Clary was not only in charge of bonding decisions but decisions involving "site problems." All of Barrick's dealings with Martin Mink, Landmark, and Johnson Pugh were with Clary. Id. at 133.
Beginning in or about November 2000, Landmark began experiencing severe financial problems. Landmark had been tardy in its payments to Johnson Pugh in the past. The record shows that in January 2001, however, Landmark was totally unable to continue paying Johnson Pugh. In order to keep the Fort Carson project moving ahead and generate future payments from the government, Landmark took over Johnson Pugh's employees and payroll responsibilities.
Landmark's poor financial condition became apparent in early 2001. Barrick provided Clary and Pourier the name of Bottom Line advisors, troubleshooters brought in to help Landmark, in April 2001. Pourier hired them. Bottom Line was put in control of all of Landmark's projects and bank accounts. Bottom Line took direction from Barrick regarding Landmark's payables and receivables, and Barrick had access to Landmark's financial statements and accounts. See Pltf's Exs. 62, 64, and 67.
Barrick testified that, as of March 2001, it was obvious to him that Landmark's accounting was "a disaster." Barrick depo., April 25, 2003, at 140. He explained that Clary "was fleecing" Landmark by making inter-company transfers through Martin Mink. Id. at 156. Barrick said that he often talked with the project managers at Landmark's construction site at Fort Carson who said the company was doing well and making a lot of money. In contrast, Bottom Line's results showed "inter-company transfers of a ridiculous nature," id. at 157-159, that jeopardized Landmark's financial well-being. Barrick testified that he believed these transfers were authorized and promoted by Clary.
Barrick testified during his deposition in response to Clary's questions that he "had the very strong feeling that nothing got out of your [Clary's] accounting department [Martin Mink] without your [Clary's] approval." Id. at 186. About Johnson Pugh, Barrick said to Clary, "I was told that you owned it by you. I knew by dealing with the various companies at your office. I had a distinct impression, and I think it was based on experience, that you *1062 made the decisions." Id. at 199. Barrick also said that Tom Gaboury, who Clary had made president of Johnson Pugh, was "very adamant, was very almost overbearing that you [Clary] were owner in total, absolute control, that nothing happened without your [authorization]he was very adamant about it." Id. at 200.
In deposition, Clary asked Barrick, "Do you believe that I controlled Doug [Pourier]?" Barrick responded, "Well, absolutely. Absolutely, I do.... Bill, I believe you had control over Doug and almost every action and reaction he had.... I believe you played him like a fiddle...." Id. at 224, 225. Barrick also said about Landmark: "I believe you guys were hiding payables. I believe you guys were doing improper accounting things. That's my belief.... I believe you were hiding things from me." Id. at 230. He also said that he felt that Clary told Sandy Taylor at Martin Mink to hide financial information from Bottom Line. Id. at 231. He concluded by stating, "You duped me and I caused a lot of people a lot of damage by trusting you." Id. at 236.
Bottom Line eventually gained at least partial control over Landmark's finances. Barrick told Bottom Line to "take control of all project monies for the benefit of the sureties." See Pltf's Ex. 70. And at some point during Bottom Line's employ, Mike McGinnis of Bottom Line exercised management authority over Landmark. See Dfdt's Ex. A35 (memo from Pourier on Bottom Line letterhead saying McGinnis was president of Landmark). At the beginning of June 2001, Bottom Line transferred $400 thousand of Landmark funds to their own account and drafted a cashier's check for $400 thousand to themselves. After a June 4, 2001 meeting at which those transactions were discussed, Pourier fired Bottom Line. See Pltf's Ex. 72.
Greg Smith, vice president of Landmark until June 2001, cooperated as a witness for Mountbatten in exchange for release from his own indemnification agreement. He testified that after meeting Clary in Houston and meeting with Pourier in Denver, Clary called him and offered him the vice president job. Smith said at trial that he thought JP's prices were extraordinarily high, and shared his concerns with Pourier. Smith said that he encouraged Pourier to out-source Landmark's work to companies not owned or controlled by Clary, but Pourier thought this would anger Clary. So Pourier never suggested this to Clary, who, Smith testified, ultimately decided who Landmark would hire. Smith said that he could have saved Landmark hundreds of thousands of dollars if he had not hired Johnson Pugh.
Smith also testified that he never was able to get accurate financial information about Landmark from Martin Mink. He said Clary, Pourier, and Taylor told him Landmark was financially able to complete its contracts, which turned out to be false. He described Landmark as dependant on the Clary companies for financial, accounting, and human resources services. Smith said he took instruction from Pourier and Clary, and that Clary instructed him on almost all of the substantive aspects of Landmark's business. He said that Taylor of Martin Mink managed Landmark's finances, often under Clary's direction.
Smith testified that he understood Johnson Pugh was a Landmark subcontractor at Fort Carson. He testified that JP's staff was converted into Landmark employees, and that Landmark did the Fort Carson work, not JP. He said there were quite a few PI people who worked for Landmark. He also testified that he thought Landmark opened accounts to buy materials after it took over Johnson Pugh's employees and work at Fort Carson. *1063 Smith testified in response to Clary's questions that "it was well known that Johnson Pugh did not do the work" at Fort Carson. Clary asked if Smith thought Clary controlled Pourier. Smith said, "I think you did." When asked if Clary controlled Landmark, Smith replied, "I believe you did."

B. Johnson Pugh
Shortly after taking on the Fort Carson project, Pourier decided to replace Landmark's mechanical subcontractor, CBD. He told Clary this, and Clary formed a new company, Johnson Pugh Mechanical, to provide services for Landmark on the Fort Carson project. As of August 1998, Clary was the sole shareholder of JP. See Pltf's Ex. 45. Soon after forming JP, in 1999, Clary set up a holding company called JKH into which he placed control of JP. See Defendant's Ex. H.
Aside from being its founder, Clary was a primary credit-card holder for JP. See Dfdt's Ex. A18. Clary was the only person authorized to add or delete signatories for JP accounts, and signed documents as JP's secretary. See Dfdt's Ex. V. In fact, Clary credibly testified that he held all the official officer positions for which the Johnson Pugh by-laws provided. See Dfdt's Ex. F. Two JP accounts received money from Martin Mink, whose business was in pertinent ways controlled by Clary, as demonstrated by the testimony of Nancy Krenek. See also, Dfdt's Ex. V, at 31. Moreover, after making a July 30, 2000 Services Agreement between JP and Clary's company, Millshop, Clary never told JP's president, Gaboury. See Dfdt's Ex. J.
Landmark was paid by the United States government for work that was completed at Fort Carson. Clary credibly testified that he has never seen any payroll statements or other indicia that JP finished the work at Fort Carson. See Dfdt's Ex. A22. The only evidence presented at trial suggesting that JP finished the work consists of the incomplete subcontracts and subcontracts signed by Nancy Krenek, and the JP requests for payment from Landmark.
In July 2000, Clary gave all the JKH stock to Michael Adams, a former PI employee to whom Clary believed he owed money arising from an agreement based on work for Vandenburg Air Force Base, for the nominal consideration of $10. See Pltf's Ex. 49, 50 (bill of sale); Dfdt's Ex. I. Adams and Clary set up a "Services Agreement" by which Adams-new owner of JP-handed over day-to-day control of the company to Clary. See Pltf's Ex. 55; Dfdt's Ex. J. The evidence shows Adams was never a signatory on JP accounts. And despite facts to the contrary, Clary at one time held himself out to be JP's sole shareholder. Dfdt's Ex. A17 (Art Klein Construction letter).
JP's actual owner, Adams, testified that JP employees were on the Landmark payroll in January 2001. He said he was forced to turn over any control to Clary. He testified that Clary directed management policy at JP and controlled JP's funds. He also said that Clary closed JP's business, changed the locks, and authorized Krenek of Martin Mink to sign payment requests from Clary. Adams learned only after the fact that all of JP's employees were either fired or transferred to Landmark.
Adams testified that in July 2000, Clary approached him with an offer to sell him JP. Adams testified that he did not know that Clary was a signatory on JP's accounts, and that Adams, despite owning the company, never had signature authority. Moreover, Adams was never paid by Clary under the Services Agreement. Adams testified that Clary suggested he file this lawsuit. Upon cross-exam by Clary, Adams testified that Clary gave *1064 Krenek signing authority over the JP payment requests that form the basis of this lawsuit.
Tom Gaboury, president of JP, was-on the surface-responsible for setting up the company, securing projects, hiring staff, setting up offices, completing billings and all of the day-to-day operations of the company until February 9, 2001, the last day Gaboury worked after Clary terminated him. Yet Clary signed Gaboury's termination form as his supervisor. See Dfdt's Ex. A8. On the form, "closed business" is given as a reason for the termination. Plaintiff argued that Gaboury acted independently of Clary. It is clear to me, however, that in many ways Gaboury depended on and submitted to Clary's direction.

C. Martin Mink
Clary-owned Martin Mink Corporation provided accounting services for all the Clary companies and for Landmark. Clary was the sole shareholder of Martin Mink during the entire time the company existed. Clary made Sandy Taylor, a former PI employee, its president. Taylor ran Martin Mink from October 1998 until December 2001 when the company ceased doing business.
Clary testified that he, Taylor, and the client companies' presidents controlled the accounts. However, there was ample testimonial evidence that Sandy Taylor, Nancy Krenek, and others took direction from Clary. Clary himself testified that he had "substantial discussions" with Taylor concerning Martin Mink's handling of the JP and Landmark accounts.
Notwithstanding its responsibility for millions of dollars of other business' funds, it is undisputed that Martin Mink was not known for its accounting prowess. This generated a lot of complaints from the Clary "client" companies. Eventually, Clary hired the accounting trouble-shooting firm Ryan and Witmore to analyze the Martin Mink's practices and implement changes. Ryan and Whitmore billed Clary-owned PI for all of the work they performed on the Landmark and JP accounts at Martin Mink. See Dfdt's Ex. A19. Clary is listed as the contact at PI, id. at 13, and the work was for PI "and associated entities." Id. at 11.
Joel Nazdin oversaw Ryan and Witmore's activities at Martin Mink from the summer of 2000 to October 2001. Nazdin has an MBA, was a general contractor, and analyzed the financial and operations workings of Landmark and JP. He testified that he worked with Taylor and Krenek, and reviewed job costs, financial reports, and budgets of Landmark and JP. Nazdin testified he did not know that Clary owned Martin Mink.
Pourier and, significantly, Clary, hired Nazdin as president of Landmark on June 8, 2001. See Pltf's Ex. 74. Nazdin held himself out as president of Landmark. Id. Significantly, he wrote a memo to Clary concerning Landmark's "critical core issues," sent it to Clary, and copied it to Taylor, but never copied or shared it with Landmark's owner, Pourier. Dfdt's Ex. A23. Nazdin testified on cross examination that to the extent he wanted to get anything done with Landmark, he talked to Clary about it, not Pourier.
Nazdin testified that Martin Mink's poor accounting practices made it difficult for him to reconcile the payables and receivables for Landmark and JP. He said the invoicing and payment services between the companies serviced by Martin Mink were extraordinarily "sloppy." At the recommendation of Ryan & Witmore, Martin Mink set up "due to" and "due from" accounts for each of the companies it serviced to make it easier to reconcile the accounts.
*1065 Despite his review of the companies' accounts, Nazdin testified that he found no evidence that JP was a subsidiary of PI or Landmark. He testified that each company had a separate partition within Martin Mink's "Timberline" accounting system, so each had separate financial books. However, Nazdin also testified he never saw ownership documents for any of the Clary companies.
Nazdin, who was in charge of Landmark while keeping track of Martin Mink's accounting procedures, testified on cross examination that he did not know of anything showing that JP had employees after February 2001. Nazdin also testified that Landmark completed the work at Fort Carson, and was paid by the United States.

D. TM Solutions
TM Solutions is yet another company set up by Clary. Its role was to coordinate the litigation at issue here to benefit the Clary companies. On cross, Clary credibly testified that TM Solutions signed agreements with JP and Landmark to pursue claims on behalf of those companies for a cut of the potential lawsuit proceeds. See Pltf's Ex. 56. Sandy Sawicki, of Clary's companies PI, Petrus, and Lester, originally ran TM solutions.

E. Experts' Testimony

1. Johnson
Robert Johnson, Plaintiff's accounting expert, a certified public accountant, certified fraud examiner, and certified valuation analyst, testified at trial that he analyzed Martin Mink's records of JP's and Landmark's business. Johnson concluded that JP was not an alter ego of Landmark or Clary. I am not convinced his review was thorough or completely grounded in the facts, as Johnson admitted he came to his conclusions only a week before trial. Therefore, I discount his opinions.
Johnson said that the mere fact that Clary was signatory on JP's accounts and was solely authorized to add and delete signatories does not mean he had dominion and control over JP. See Dfdt's Ex. V. The fact that Clary terminated Gaboury did not change Johnson's opinion. See Dfdt's Ex. A8. The fact that Clary was a primary credit card holder for JP did not change his opinion. See Dfdt's Ex. A18. The Clary letter to Art Klein Construction saying Clary was the lone shareholder of JP, although Clary was not a shareholder, did not change his opinion, either. See Dfdt's Ex. Z.
However, the fact that Gaboury told Art Klein that Clary owns JP and "shut it down" did concern Johnson. See D Ex. A64. And in his analysis of JP and Landmark records produced in discovery, Johnson did not see any information that JP actually performed the work at Fort Carson. Johnson also testified that his research showed Clary controlled funds that he wired into and out of Landmark.
Johnson admitted that the fact that the last check to JP employees was dated February 22, 2001, see Dfdt's Ex. O, is an indication that either employees from that date on were terminated, or the company was shut down, or the employees worked for someone else. Johnson testified that JP was undercapitalized, that Landmark was undercapitalized, that Clary had "broad power" under the Services Agreement with Adams, that Clary was a common officer of Landmark, PI, and JP, and that Landmark taking on JP's payroll was not temporary. He also testified that it is possible for a person such as Clary to control an entity even without being involved in its day-to-day operations.

2. Lynch
Defendant's financial expert, Ed Lynch, a certified public accountant and forensic *1066 accountant at Deloitte and Touche, credibly testified that the relationships of Landmark and JP resembled that of parent and subsidiary. While Mr. Lynch acknowledged that he had not seen Johnson Pugh referred to as a subsidiary in Martin Mink's records, he testified that the accounting system made the relationship between Johnson Pugh and Landmark "smell" like a subsidiary one.
In his expert report, Pltf's Ex. 87, Lynch opined that his analysis of the business and financial facts indicated an alter ego relationship between Johnson Pugh and Landmark. The indicia of an alter ego relationship on which he relied are set out in the article, "Setting the Record Straight on Insider Payment Bond Claims," Fidelity and Surety Law Committee Newsletter, Fall 2002, 18. Finding his analysis credible and comprehensive, I set it out in detail here.

a. Domination and Control
The first factor Johnson considered was whether Clary, President of PI, had common control over Landmark and Johnson Pugh, and/or exercised domination of managerial decisions. Lynch concluded that Clary had common control over and dominated the managerial decisions of both companies.
He listed several bases for this conclusion. The JP Services Agreement between Clary and Adams stated that Clary was to "insure the continued operations of the companies," and was responsible for 1) developing strategic planning to ensure profitable growth; 2) monitoring job and overhead costs; 3) insuring performance and quality control; 4) reporting regularly to Adams; 5) accounting, bookkeeping, human resources, insurance and other services provided through Lester, Petrus, and Martin Mink, and 6) making payments to government, insurance and other agencies. Second, Adams confirmed that Clary performed the managerial duties at JP. Adams deposition, August 14, 2002, at 113-114 (Adams said that when money came in to JP, Clary decided how to spend it.). Adams also said that Clary recommended that Johnson Pugh file the present lawsuit. Id. at 125-126.
In the January 26, 2001 letter to Tom Clemmons of Art Klein Construction, Clary stated, "I am the sole shareholder of Johnson Pugh." Pourier stated that Clary controlled JP's operations at Fort Carson. Pourier deposition, at 223. Clary's was one of three authorized signatures on JP's commercial and fiduciary signature cards for JP's five Chase Bank accounts. The other two signatures were Kathleen Clary's and Gaboury's.
Furthermore, Pourier testified by deposition that Clary was the driving force behind Landmark's management, and effectively ran the Fort Carson job for Landmark. Id. at 36-37. Clary's was one of two authorized signatures on Landmark's commercial and fiduciary signature cards for its Chase Bank accounts. Moreover, Pourier was unaware his signature stamp was an additional authorized signature. Id. at 28.
Sandy Taylor of Martin Mink indicated that Clary and Pourier were the only two people to control Landmark's funds. Taylor deposition, at 46. Barrick testified that Clary controlled Landmark. Barrick deposition, April 25, 2003, at 132. Barrick also testified that Pourier told him to talk directly to Clary, rather than Pourier, about any Landmark business. Barrick deposition, September 25, 2002, at 69-70.
Finally, in the Art Klein letter that he signed, Clary implied that he was part of Landmark's management. He stated, "We are in the process of completing Johnson Pugh's contracts.... Landmark Construction Corporation now employs the former *1067 Johnson Pugh personnel and will execute the on-site work." Dfdt's Ex. A17.

b. Common Ownership
Clary owned Martin Mink, Petrus, and Lester, and those companies provided support services such as accounting, bookkeeping, human resources management, and insurance to JP and Landmark. While Adams and Pourier owned JP and Landmark, respectively, both operated under the control of Clary, so the fact that Clary owned the support companies and could influence them makes this factor important.

c. Common Corporate Directors and Officers
Clary represented himself as secretary of both JP and Landmark. On both JP's and Landmark's "Corporate Secretary's Certificate Regarding Accounts" to Chase Bank, dated November 1, 1999, see Pltf's Ex. 40, and November 6, 1998, see Dfdt's Ex. A34, respectively, Clary signed as secretary.

d. Lack of Corporate Formalities
Johnson Pugh's by-laws required the company to have at least one director and to designate a president, vice president, secretary, and treasurer. Clary was director. Gaboury was president. Clary held himself out as secretary. However, neither a vice president, secretary, nor treasurer was ever designated officially.

e. Corporate Loans between Entities
Lynch concluded that JP, Landmark, and other Clary companies commingled funds and financed each other's operations. For example, on JP's December 31, 2001 internal balance sheet, there are multiple due to/due from accounts with $25,380 due from PI, and $63,237 due from Landmark. Lynch also concluded that JP, Landmark, and PI transferred to and from each other millions of dollars, what he deemed "a considerable amount of money," between the October 8, 1998 and October 17, 2001.
Pourier testified by deposition that the Landmark Due To/Due From system from January 1, 2001 through May 30, 2001 included accounts for JP, PI, Martin Mink, Petrus, and Lester. Pourier said that Clary told him payments due to the Clary companies could be postponed because "I [Clary] control them, so I can do what I want." Pourier deposition, 45-46.
During a June 4, 2001 Landmark management meeting in Denver, attended by Pourier, Greg Smith, Barrick, and various project managers, but not Clary, Barrick said, "They [Clary and Martin Mink] fleeced Landmark of money ... it was like a cookie jar." Dfdt's Ex. S, transcript of June 4, 2001 meeting, at 16. Sandy Taylor of Martin Mink testified in her deposition that Landmark used JP and other Clary-owned companies as "a type of credit card" to finance itself. Dfdt's Ex. A91, Taylor deposition, 109-110.

f. Personal Loans Between Entities and Their Representatives
There is no evidence of personal loans.

g. Undercapitalization
Based on Johnson's and Lynch's testimony, it is undisputed that both JP and Landmark were undercapitalized.

h. Common Offices
Lynch reported that JP and Landmark shared an address at 13498 Pond Springs Road, Bldg. A, Austin, Texas, with PI at least in October and November 1999 and May 2000. This is substantiated by Pourier's testimony.

i. Common Employees
Michael Adams worked for PI or Clary from 1993 until July 2001. While on PI's *1068 payroll, Adams performed consulting work for Landmark and was paid by Landmark. Adams depo., 34. Adams stated that other employees "got traded back and forth occasionally." Id. at 26. Pourier testified in his deposition that Michael Poupart was a Landmark project manager at Fort Carson, yet Poupart was on PI's payroll. Pourier depo., 22. Pourier also indicated that PI hired employees for Landmark. Id. at 26. Moreover, as I set out earlier, there is abundant evidence that shows Landmark controlled JP employees and paid them, and Clary controlled both companies.

j. Shared Payment of Expenses and Employees
Abundant evidence shows Landmark paid former JP employees. See, e.g., Dfdt's Ex. Y (Pourier letter to Mick Traver of JP); Dfdt's Ex. Z (Clary letter on Landmark letterhead to Clemmons at Art Klein Construction).

k. Lack of Independent Business
According to the testimony of Lynch, Adams, Taylor, Pourier, and Barrick, along with numerous exhibits, JP and Landmark received significant financial and managerial support from Clary-owned companies.

II. Conclusions of Law
Defendant Mountbatten contends Johnson Pugh is an alter ego or insider of Landmark due to the involvement of Clary in both companies. Defendant also argues Johnson Pugh failed to perform and complete the work on the Fort Carson project, so is not entitled to payment in any event. Plaintiff contends in response to Defendant's alter ego and insider defense that Mountbatten had full knowledge of the relationship between Landmark, PI, Johnson Pugh and Mr. Clary prior to issuing any bonds to Landmark.
The Miller Act states:
(b) Type of bonds required.  Before any contract of more than $100,000 is awarded for the construction, alteration, or repair of any public building or public work of the Federal Government, a person must furnish to the Government the following bonds, which become binding when the contract is awarded:
(1) Performance bond.  A performance bond with a surety satisfactory to the officer awarding the contract, and in an amount the officer considers adequate, for the protection of the Government.
(2) Payment bond.  A payment bond with a surety satisfactory to the officer for the protection of all persons supplying labor and material in carrying out the work provided for in the contract for the use of each person. The amount of the payment bond shall equal the total amount payable by the terms of the contract unless the officer awarding the contract determines, in a writing supported by specific findings, that a payment bond in that amount is impractical, in which case the contracting officer shall set the amount of the payment bond. The amount of the payment bond shall not be less than the amount of the performance bond.
40 U.S.C. § 3131.
(b) Right to bring a civil action. 
(1) In general.  Every person that has furnished labor or material in carrying out work provided for in a contract for which a payment bond is furnished under section 3131 of this title and that has not been paid in full within 90 days after the day on which the person did or performed the last of the labor or furnished or supplied the material for which the claim is made may bring a civil action on the payment bond for the amount unpaid *1069 at the time the civil action is brought and may prosecute the action to final execution and judgment for the amount due.
40 U.S.C. § 3133.
"[T]he Miller Act was designed to provide an alternative remedy to the mechanics' liens ordinarily available on private construction projects. Because a lien cannot attach to government property, persons supplying labor or materials on a federal construction project were to be protected by a payment bond." J.W. Bateson Co., Inc. v. U.S. ex rel. Bd. of Trustees of Nat. Automatic Sprinkler Industry Pension Fund, 434 U.S. 586, 589, 98 S.Ct. 873, 55 L.Ed.2d 50 (1978). In essence, the Act provides remedial protection for providers of labor and materials to public construction projects to insure they receive payment. See St. Paul-Mercury Indem. Co. v. United States for the Use of Jones, 238 F.2d 917, 921 (10th Cir.1956).
Under the Act, a subcontractor is one who performs for and takes from the prime contractor a specific part of the labor or materials requirements of the original contract. Id. at 922. Because a principal cannot recover on a payment bond, see United States for Use of Briggs v. Grubb, 358 F.2d 508 (9th Cir.1966), the Act does not protect suppliers of labor and materials who are "insiders" or within the "family" of the principal's entities. American Casualty Co. v. Assiran, 289 F.Supp. 645, 646 (D.Mass.1968).
The purpose of a Miller Act bond is to protect those suppliers of labor and materials who are not part of `the family' of the principal and who are, as it were, strangers dealing without opportunity for knowledge of the principal's resources and without a common commitment in joint ventures.
As Circuit Judge Barnes rightly ruled in United States for the Use of Briggs v. Grubb, 358 F.2d 508, 512 (9th Cir.1966) [supra]: `While a Miller Act payment bond does make the surety liable for labor and materials furnished by a subcontractor when the contractor under the bond defaults, such a bond does not make the surety liable for monies expended on the contract by a partner or joint venturer of the contractor under the bond. This principle has been settled by cases interpreting the coverage of the Miller Act and its statutory predecessor, the Heard Act. [Citing Hardaway v. National Surety Co., 211 U.S. 552, 29 S.Ct. 202, 53 L.Ed. 321 (1909); St. Paul-Mercury Indem. Company, 238 F.2d 917, supra; United States (for Use and Benefit of Walker) v. United States Fidelity & Guaranty Co., 4 F.Supp. 854 (D.Wyo.1933); National State Bank v. Terminal Constr. Corp., 217 F.Supp. 341 (D.N.J.1963).]'
The foregoing doctrine has been applied to those who enter into a co-adventure with the principal [citing Hardaway, 211 U.S. at 559, 29 S.Ct. 202], to subsidiaries of the principal [citing Continental Casualty Co. v. United States, 308 F.2d 846 (5th Cir.1962)], and to a corporation controlled by the same individual who controls the principal named in the bond [citing National Surety Corp. v. United States, 378 F.2d 294, 295-296 (5th Cir.1967)].
Id. at 647.
In National Surety Corporation, the Fifth Circuit, in concluding that one individual controlled both the contractor and an assignee to the contract, reasoned: "[i]t is quite clear to us that William B. Uhlhom operated in the form of Construction [one company operated by him] or International [another company operated by him] whenever it suited him. We conclude that with respect to the performance of the FAA contract the two concerns were operated essentially as one entity, namely, the *1070 prime contractor." National Surety Corp. at 296.
The Miller Act was not designed to protect such prime, or general, contractors. Therefore, a partner or a joint adventurer in the general contract itself, or a portion of it, would not be one of those protected by the Miller Act. St. Paul-Mercury Indem. Co., 238 F.2d at 921. "The true relationship must be determined by the conduct of the parties, together with all the other material facts and circumstances...." Id.
I conclude based on the reasons stated below that Clary operated his many concerns, including JP and Landmark, as essentially one entity.

A. Johnson Pugh's Status
It is not disputed that Landmark was paid for the Fort Carson work by the United States government. However, Plaintiff Johnson Pugh established little, if any, evidence that it was a viable subcontractor to Landmark that supplied materials or labor for the projects bonded by Mountbatten pursuant to the Miller Act. For Fort Carson barracks 2052, 2054, and 2070A, there is no evidence on the record of fully executed subcontract agreements. This is despite Mr. Gaboury's testimony that fully executed copies of the subcontracts were sent to Martin Mink. Johnson Pugh presented no credible excuse why it failed to put its own, complete subcontracts into evidence. More importantly, the bonds for those buildings have effective dates of March 8, 2001. As I discuss below, Johnson Pugh's existence ceased before this date, so Plaintiff was unable to provide either labor or materials when the bonds were in effect.
For Fort Carson buildings 2071 and 2072, the only fully executed Johnson Pugh subcontracts in evidence are those signed by employees of Martin Mink. Johnson Pugh employees did not sign the contracts. Nancy Krenek-a Martin Mink employee, not a Johnson Pugh employee-signed one of them, and signed Joe Schuchardt's name on the other. There is no evidence that Krenek had the authority to form contracts on behalf of Johnson Pugh.
Krenek testified that she signed these under the direction of Bill Clary. This is important because, as I will discuss below, Clary's dominion and control over Johnson Pugh's operations was vast. Moreover, Mike McGinnis, once-president of Landmark, questioned whether the subcontracts even existed at all. See Dfdt's Ex. S. Furthermore, there was uncontradicted testimony that Doug Pourier's signature stamp was used without his authorization to sign Landmark to these subcontracts. Pourier testified that he only authorized the stamp to be used for payment and payroll purposes, not to sign contracts.
Defendants argue that I need only look at the effective date of the bonds at issue to see that any work Johnson Pugh performed in 2000 was not for any project bonded with effective dates no earlier than February 12, 2001. The vast preponderance of the evidence supports the conclusion that Johnson Pugh ceased to exist as a mechanical subcontractor on January 26, 2001. Therefore, I conclude that Johnson Pugh did not perform Fort Carson work during the time for which it makes its claims on the bonds.
The most important evidence supporting this conclusion is as follows. Clary, Adams, and Pourier all testified that Landmark self-performed the mechanical work at Fort Carson after that January 26, 2001 in place of Johnson Pugh. And a report prepared by Nancy Krenek confirms that all but three the employees of Johnson Pugh were terminated or received their last paycheck no later than January 26, 2001, and the others were terminated as of February 22, 2001, well before March 8, *1071 2001, the bonds date. See Defendant's Ex. O.
Clary's actions with regard to both Landmark and JP early in 2001 further demonstrate JP's ultimate failure. Defendant's Exhibit A65 is a January 24, 2001 letter from Robert Frazer, Vice President and General Counsel of Acstar insurance company, which bonded JP's work on the Colorado Springs transit job, a smaller project in which JP and Landmark cooperated. It is addressed, tellingly, to Clary not of PI or even Johnson Pugh, but to Clary of Landmark Corporation.
In the letter, Frazer inquired into Clary's intentions regarding the "shutting down" of Johnson Pugh. Defendant's Exhibit A64 is a letter from Tom Clemmons of Art Klein Construction to Frazer relaying a conversation he had with Tom Gaboury of Johnson Pugh. The letter states that Johnson Pugh would no longer be in business, that Clary was responsible for JP's closing, and that pursuant to Clary's direction, Landmark was going to complete JP's subcontract commitments on the Colorado Springs transit project. In Clary's response to Clemmons, he confirms he is the sole stock holder of Johnson Pugh, that Landmark is now employing Johnson Pugh's employees, and that Landmark would complete JP's sub-contractual requirements on the other project, the Colorado Springs transit job. See Dfdt's Exhibit A17. Finally, Defendant's Exhibit A8 is Tom Gaboury's termination report, dated February 8, 2001. In it, Clary provides the reason for Gaboury's departure from Johnson Pugh: "Closed business," in the past tense.
There is no evidence of Johnson Pugh certified payrolls, checks, or invoices from subcontractors or suppliers during the time the bonds were in effect. See Dfdt's Exs. A64, A65. It is significant that Michael Adams, owner of JP during this time, could not testify about the closure of his own company because he was in Washington state doing business as an employee of Landmark. For these reasons, it is clear to me that JP did not have employees during the time-frame during which the bonds were in effect.
I next consider whether Johnson Pugh provided materials and/or labor on the bonded projects. I conclude based on a preponderance of the evidence that Johnson Pugh did not supply labor to Landmark during the time the bonds at issue were effective because it did not have employees at the time. Moreover, even though Michael Adams, Joel Nazdin, and Nancy Krenek testified that Johnson Pugh paid for materials that Landmark used to complete the Fort Carson subtracts, no documentary evidence whatsoever was offered to support the their supposition that JP provided materials or paid for them after Landmark took over the JP work at Fort Carson.
There is also no evidence of reports made with the Martin Mink Timberline system for JP during the time that the bonds were effective. What is in evidence are payment request forms-all but two of which were prepared by Nancy Krenek, the Martin Mink employee, at the express direction of Bill Clary. And the only testimony in support of the assertion that JP actually provided materials came from Krenek, who took direction from Clary. But Clary himself testified that JP did not provide materials or pay for them.
Plaintiff's case suffered from other weaknesses. Plaintiff's case did not include employees of Johnson Pugh except Clary. It included no officers or employees of Landmark either, except Clary and Pourier. Moreover, Plaintiff did not provide complete copies of many of the subcontracts on which it brought suit. Mountbatten's witnesses, on the other hand, included the former president of *1072 Landmark, its former vice president of operations, and a former employee of JP. All of them consistently testified that Johnson Pugh did not supply materials or labor to Landmark's project at Fort Carson after January 2001, when Bill Clary locked the JP doors and fired the JP employees, then proceeded to give orders to Nancy Krenek.
I conclude Johnson Pugh was not paid because it did not do the work during the effective bond dates. The preponderance of the evidence shows that, if the work was completed at all, it was done by Landmark, and payment was made to Landmark from the United States.

B. Alter Ego Analysis
I have concluded that Johnson Pugh has not established it was a bona fide subcontractor during the time covered by the Mountbatten bonds. However, assuming, arguendo, that there are valid payment bond claims, the question arises whether Johnson Pugh is so intermingled with Bill Clary or Landmark that JP rises to the level of an insider or an alter ego of Bill Clary or Landmark, so is not protected by the bonds.
The determination of whether one company is an alter ego of another is primarily a question of fact. I consider ten factors in making the ultimate determination whether recognition of a separate corporate entity would result in injustice in a given case:
(1) The parent corporation owns all or majority of the capital stock of the subsidiary;
(2) The parent and subsidiary corporations have common directors or officers;
(3) The parent corporation finances the subsidiary;
(4) The parent corporation subscribes to all the capital stock of the subsidiary or otherwise causes its incorporation;
(5) The subsidiary has grossly inadequate capital;
(6) The parent corporation pays the salaries or expenses or losses of the subsidiary;
(7) The subsidiary has substantially no business except with the parent corporation or no assets except those conveyed to it by the parent corporation;
(8) In the papers of the parent corporation, and in the statements of its officers, `the subsidiary' is referred to as such or as a department or division;
(9) The directors or executives of the subsidiary do not act independently in the interest of the subsidiary but take direction from the parent corporation; or
(10) The formal legal requirements of the subsidiary as a separate and independent corporation are not observed.
Lowell Staats Min. Co., Inc. v. Pioneer Uravan, Inc., 878 F.2d 1259, 1262-1263 (10th Cir.1989), citing Fish v. East, 114 F.2d 177, 191 (10th Cir.1940) (applying Colorado law). The parties agree that the Lowell Staats alter-ego test controls. However, I note that I apply it here by construing Bill Clary as an individual, PI, or Landmark as the "parent corporation" as phrased in Lowell Staats. I consider JP the "subsidiary" for purposes of this analysis. I note that all of the factors need not be present for me to find an alter ego relationship. Lowell Staats at 1262. I also note that my Lowell Staats analysis in many ways overlaps with Ed Lynch's analysis, supra.
A related concept, "insider" bond claims arise when the principal subcontracts a portion of the work to a wholly owned subsidiary, alter ego, joint venture, or other related "friendly company." See Lane v. Maryhaven Ctr. of Hope, 944 F.Supp. 158 (E.D.N.Y.1996) (To establish a claim for individual liability under the alter *1073 ego theory, a plaintiff must plead that the person exercises such dominion and control that the corporation had no separate will of its own and that the domination and control was used to commit a fraud or wrong against the plaintiff.) (emphasis added.). In sum, payment and performance bonds do not cover an entity controlled by the same person that controls the principal named in the bond or has otherwise agreed to indemnify the surety.
Here, the bonds at issue do not cover JP because JP was controlled by Clary, who also controlled Landmark, the principal, and agreed to indemnify Mountbatten. It is undisputed that Bill Clary is an indemnitor of Mountbatten on Landmark's behalf. Clary testified that he was not involved in the day-to-day activities of Johnson Pugh. However, the preponderance of the evidence shows that while Clary might not have controlled every JP decision, he made or heavily influenced the major decisions.
Clary fired the JP employees while the owner of company, Michael Adams, was out of town doing business for Landmark, changed the locks on the doors, and told third parties that he owned the company. Clary told Nancy Krenek how to execute subcontracts and payment requests for JP. All the while Clary and his wife were signatories on the main depository accounts for Johnson Pugh Mechanical, Landmark, and PI Construction, while Adams has never been able to sign a check for Johnson Pugh. Finally, it is undisputed that Adams signed off broad powers of control to Clary as part of the Johnson Pugh Services Agreement.
The evidence overwhelmingly supports the conclusion that Bill Clary, an indemnitor of Mountbatten, exerted dominion and control over Johnson Pugh, Landmark, and Martin Mink. As indemnitor and signatory on Landmark's accounts, Clary had control over Landmark's cash flow. Clary incorporated Johnson Pugh in 1998. He then transferred its shares to his own holding company, JKH incorporated. According to the testimony of Tom Gaboury, no offices could be opened for Johnson Pugh without Clary permission. According to the testimony of Greg Smith as well as Gaboury, Clary made sure that Johnson Pugh would not be replaced at Fort Carson, even when presented with a suggestion that Landmark could save money using a different mechanical subcontractor.
I conclude based on a preponderance of the evidence that Landmark's involvement at Fort Carson was dependant on Clary. Clary and Pourier hired Joel Nazdin, who was originally hired as a Martin Mink consultant. Clary's company PI paid for his consulting services. Later, Clary and Pourier made Nazdin president of Landmark. Clary insisted that Landmark's bookkeeping be handled by the company he owned and controlled, Martin Mink, as evidenced by the testimony of Nancy Krenek. Other evidence supports this conclusion, including Joel Nazdin's testimony about memos to Clary-but not Pourier-about critical core issues for Landmark. And Nazdin was retained by Clary's PI Construction to perform work for all of the Clary companies including Landmark, as evidenced by the consulting fee statements.
I am convinced upon observation and review of the whole of Clary's testimony that he demonstrates an extraordinary depth of knowledge about the operations of Johnson Pugh, as well as those of Landmark and Martin Mink.
Defendant's financial expert, Ed Lynch, testified that the relationships of Landmark and JP resembled that of parent and subsidiary. Moreover, neither Plaintiff's expert Johnson nor Lynch had ever heard of a bookkeeping service such as Martin Mink that charged its clients a percentage of the gross revenue of the company, starting *1074 at 2 percent and sliding down to .75 percent. This is circumstantial evidence that the accounting services provided by Martin Mink were manipulated by Clary to increase Martin Mink's value.
The preponderance of the evidence leads me to the following Lowell Staats conclusions:

1. The parent corporation owns all or majority of the capital stock of the subsidiary
For at least some period of time-from its inception until he transferred the shares to Tom Gaboury through the holding company JKH-Clary, the sole owner of PI Construction corporation, owned the capital stock of Johnson Pugh Mechanical corporation. And Clary represented in the Art Klein letter that he was the sole shareholder of JP even though Michael Adams actually owned the company.

2. The parent and subsidiary corporations have common directors or officers
Clary was a common director or officer of PI, Landmark, and Johnson Pugh. He held all the officer positions of PI and Johnson Pugh, and he held himself out as Landmark's secretary.

3. The parent corporation finances the subsidiary
The fact that Landmark took over the employees of Johnson Pugh Mechanical, and-according to the testimony of Smith as well as Pourier-completed the work, indicates that Landmark financed Johnson Pugh. Moreover, Clary, through his influence over Martin Mink, was able to control who Landmark would pay.

4. The parent corporation subscribes to all the capital stock of the subsidiary or otherwise causes its incorporation
It is undisputed that Clary caused the incorporation of JP and once owned all its stock.

5. The subsidiary has grossly inadequate capital
It is undisputed that Johnson Pugh was in serious financial trouble and undercapitalized.

6. The parent corporation pays the salaries or expenses or losses of the subsidiary
After Johnson Pugh's employees were fired, Landmark proceeded to pay Johnson Pugh's employee expenses.

7. The subsidiary has substantially no business except with the parent corporation or no assets except those conveyed to it by the parent corporation
The evidence shows that close to seventy percent of JP's business was for Landmark.

8. In the papers of the parent corporation, and in the statements of its officers, `the subsidiary' is referred to as such or as a department or division
It is undisputed that JP was never listed as a subsidiary in any records. However, Defendant's expert Lynch testified that the accounting system made the relationship between Johnson Pugh and Landmark "smell" like a subsidiary one. And Plaintiff's expert Johnson believed the connections between the companies were enough to illuminate such a relationship.

9. The directors or executives of the subsidiary do not act independently in the interest of the subsidiary but take direction from the parent corporation
Clary made major decisions for Landmark. The directors or executives of Landmark, Smith and Pourier, did not act independently, but took direction from Clary. Clary also made major decisions for JP. Myriad evidence suggests that Clary controlled much, if not all of what was going on with JP, even when Tom Gaboury was president.

*1075 10. The formal legal requirements of the subsidiary as a separate and independent corporation are not observed
JP did not operate according to its bylaws. The officer and director positions were either not filled at all or filled only by Clary.
I am convinced Johnson Pugh was an alter ego and insider of Landmark and Bill Clary. And Landmark and Johnson Pugh form a part of the same corporate family for purposes of determining liability under the payment bond. Clary exercised extraordinary dominion and control over Landmark and JP, while also maintaining influence over each company's finances through Martin Mink. Counsel for Mountbatten stated that even if that were not the case, the purposes behind the Miller Act would be completely frustrated if an alter ego-JP-of the Mountbatten's indemnitors-here Clary and Landmark-were able to recover. I agree.
Therefore, I conclude that Johnson Pugh's claims are "insider" claims, asserted by an entity closely affiliated with the principal-Landmark  and Mountbatten's indemnitors, Bill Clary, Doug Pourier, and PI. To permit recovery on the bond would undermine the policies behind the prohibition against insider claims.
I conclude that payment by the United States to Landmark constitutes payment to all alter-egos and affiliated companies, including Johnson Pugh. If I were to conclude that Landmark was not dominated and controlled by Bill Clary, the purposes of the Miller Act would be completely frustrated. Overwhelming evidence shows that Clary, indemnitor of Mountbatten, controlled the entity that is submitting the payment bond claim, Johnson Pugh.
As a result of the General Indemnity Agreement, permitting any liability and allowing Johnson Pugh to recover on the bonds would lead to circular payment to and from the same corporate entities. Therefore, I conclude that Mountbatten is not obligated to make any payment pursuant to the payment bonds in question. Moreover, as I stated above, because Johnson Pugh failed either to form or to complete its subcontracts during the time the bonds were effective, it is not entitled to recover on the bonds. As a result, Mountbatten is not bound to pay JP, and Landmark and Clary are not obligated to indemnify Mountbatten because Mountbatten does not incur liability. Finally, Mountbatten's cross-claim and third-party claims are moot.

C. Estoppel
Plaintiff contends that Mountbatten is estopped from asserting the affiliated nature of Landmark and Johnson Pugh. I disagree. Any knowledge on the part of Mountbatten concerning the relationship between the entities does not alter the conclusion that, as an alter-ego and closely affiliated company of the principal and Mountbatten's indemnitors, Johnson Pugh cannot recover on the bonds. Even if Rich Barrick or Mountbatten knew that Johnson Pugh was an insider, I conclude that the Miller Act simply does not afford any protection for insiders or alter egos. Plaintiff offered no law to the contrary.
The best evidence of what Mountbatten in fact did know is Plaintiff's Exhibit No. 11, which is an extensive letter from Mountbatten's "Gateway Manager" in Austin, Jim Albright, to Tom Kay of Mountbatten. In it, Albright explains the relationship of JP to Landmark and PI. The first paragraph in the memorandum refers to three final bond requests.
The critical paragraph with respect to the knowledge of the relationship is the fifth one on the first page of Plaintiff's Exhibit No. 11. It begins, "Landmark was founded by Doug Pourier." This paragraph is important because it discusses *1076 how Landmark was founded, Doug Pourier's background and previous work with Landmark and PI, and his "solid" relationship with Clary. It continues: "As more and more of the ... contracts were `set aside' for minorities through the 8(a) program," Bill and Doug saw an opportunity to take advantage. "[T]he companies [referring to Landmark and PI] operate as separate entities but the connection is clearly visible. Landmark offices with PI and utilizes outside accounts and safety quality control services that are owned by Bill Clary. As partial consideration PI and Bill Clary indemnify bonds for Landmark." Importantly, the letter does not mention Johnson Pugh Mechanical.
Regarding Clary's fraud defense theory, it is clear to me based on Clary's testimony that he knows and understands that sureties require indemnity agreements before a bond can be issued. Clary also knows and understand that bonds are required by federal law on federal projects. If Clary and PI Construction had not agreed to indemnify Mountbatten with respect to these bonds, they very well would not have been issued. I conclude the claim has no merit.
In sum, Bill Clary effectively decided the fates of both Johnson Pugh Mechanical and Landmark, and Johnson Pugh has failed to support its claims.
Therefore, IT IS ORDERED THAT:
1) PLAINTIFF JOHNSON PUGH's claims are DISMISSED;
2) DEFENDANT MOUNTBATTEN's cross- and third-party claims are DISMISSED AS MOOT;
3) Costs are awarded to DEFENDANT MOUNTBATTEN pursuant to a statement of costs submitted within 10 days of the date of the filing of the JUDGMENT in this case; and
4) The Clerk of the Court SHALL ENTER FINAL JUDGMENT according to this Order.